**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

| | |
|---|---|
| **ALEXIS DEKANY**<br>203 Spring Street<br>Akron, Ohio 44304, | )<br>)<br>) | **CASE NO.:** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE:** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF AKRON, OHIO**<br>146 South High Street, Suite 130<br>Akron, Ohio 44308 | )<br>)<br>) | **COMPLAINT** |
| | ) | (Jury Demand Endorsed Hereon) |
| **CITY OF STOW, OHIO**<br>3760 Darrow Rd.<br>Stow, OH 44224-4038; | )<br>)<br>) | |
| | ) | |
| **AKRON POLICE DEPARTMENT**<br>217 South High Street<br>Akron, Ohio 44308; | )<br>)<br>) | |
| | ) | |
| **STOW POLICE DEPARTMENT**<br>Stow Safety Building<br>3800 Darrow Road<br>Stow, Ohio 44224; | )<br>)<br>)<br>) | |
| | ) | |
| **AKRON POLICE DEPARTMENT<br>OFFICER DREW KELLY**<br>217 South High Street<br>Akron, Ohio 44308; | )<br>)<br>)<br>) | |
| | ) | |
| **DOES 1-5**<br>217 South High Street<br>Akron, Ohio 44308; | )<br>)<br>) | |
| | ) | |
| **STOW POLICE DEPARTMENT<br>OFFICER JACOB CORFMAN**<br>Stow Safety Building<br>3800 Darrow Road<br>Stow, Ohio 44224; | )<br>)<br>)<br>)<br>) | |
| | ) | |
| **STOW POLICE DEPARTMENT<br>OFFICER LT. JAMES PRUSHA**<br>Stow Safety Building | )<br>)<br> | |

1

3800 Darrow Road                                          )
Stow, Ohio 44224;                                         )
                                                          )
**DOES 6-10**                                             )
Stow Safety Building                                      )
3800 Darrow Road                                          )
Stow, Ohio 44224;                                         )
                                                          )
and                                                       )
                                                          )
**ERIC PAULL**                                            )
Allen Correctional Institution                            )
2238 Northwest Street                                     )
Lima, OH 45801                                            )
                                                          )
                        **Defendants.**                   )
                                                          )
_____                  )

Now comes Plaintiff Alexis Dekany ("Plaintiff Dekany"), by and through her undersigned counsel, and for her Complaint states the following:

## VENUE AND JURISDICTION

1.      This action is initiated pursuant to the Civil Rights Act of 1871, 42 U.S.C. Section 1983, to redress numerous deprivations committed under color of statute, ordinance, regulation, custom or usage of rights, privileges and immunities secured to Plaintiffs under the United States Constitution.

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

3.      Venue is proper under 28 U.S.C. § 1391.

## PARTIES

4.      Plaintiff Dekany is a citizen of the United States and a resident of Akron, Ohio and was, at times relevant to this Complaint, a resident of the State of Ohio.

5.      Defendant City of Akron ("Akron") is now and was at all relevant times a municipal corporation, organized and existing under and by the virtue of the laws of the State of Ohio.

6.      Defendant City of Stow ("Stow") is now and was at all relevant times a municipal corporation, organized and existing under and by the virtue of the laws of the State of Ohio.

7.      Now and at all relevant times, Akron operated, managed, maintained, supervised and controlled the Akron Police Department ("APD").

8.      Defendant APD is now and was at all relevant times an agency of the City of Akron.

9.      Now and at all relevant times, Stow operated, managed, maintained, supervised and controlled the Stow Police Department (hereinafter "SPD").

10.     Defendant SPD is now and was at all times relevant an agency of the City of Stow.

11.     Defendant Eric Paull (hereinafter "Defendant Paull") was employed by the APD for 19 years, and served as a sergeant until August 17, 2015 upon his permanent leave from the APD. Defendant Paull served a 6-month mandatory jail sentence and is currently serving a four-year probationary sentence after pleading guilty to aggravated assault, tampering with evidence, stalking, unlawful use of a law enforcement database and violating a protection order.

12.     At all relevant times, Defendant Sergeant Drew Kelly (hereinafter "Defendant Kelly") was employed by the APD as a police officer, and was Defendant Paull's partner.

13.     Defendant Kelly was acting within the course and scope of his employment with the City of Akron and the APD.

14.     Defendants Does 1-5 were, at all times relevant, employed by the APD as officers and/or supervisors, and they were personally and directly responsible for overseeing and supervising the activities of other employees and/or agents of Defendant APD.

3

15.     Defendants Does 1-5 are sued for personally committing and/or personally participating in the commission of unlawful acts and/or omissions during the course of their employment, thereby causing Plaintiffs' injuries, expenses and losses as described herein.

16.     At all relevant times, Defendant Officer Corfman and Defendant Prusha were employed by the Stow Police Department as officers.

17.     Defendant Officer Corfman and Defendant Officer Prusha were acting within the scope of their employment with the City of Stow and the SPD.

18.     Defendants Does 6-10 were, at all times relevant, employed by the SPD as officers and/or supervisors, and were personally and directly responsible for overseeing and supervising the activities of other employees and/or agents of Defendant SPD.

19.     Defendants Does 6-10 are sued for personally committing and/or personally participating in the commission of unlawful acts and/or omissions during the course of their employment, thereby causing Plaintiff's injuries, expenses and losses as described herein.

20.     All individual Defendants are being sued in their official as well as their individual capacities.

## STATEMENT OF FACTS

21.     Plaintiff Dekany first met Defendant Paull in the fall of 2011 at the University of Akron, when she took a criminal justice class in which he was her adjunct professor.

22.     In August 2012, Defendant Paull initiated a romantic relationship with Plaintiff Dekany.

23.     Thereafter, Defendant Paull filed for divorce from his wife, telling Plaintiff Dekany that she was the "only person he has ever loved."

24.     Defendant Paull showered Plaintiff Dekany with gifts, money, and trips during their courtship and relationship.

25.　　Plaintiff Dekany and Defendant Paull began to experience problems in their relationship and in the spring of 2014 agreed to stop seeing each other.

26.　　After a few months and learning that Dekany had started another relationship, Defendant Paull began to communicate excessively in a stalking manner via text and social media, with the intent to frighten Plaintiff Dekany.

27.　　Plaintiff Dekany begged Defendant Paull on numerous occasions to leave her alone and to move on with his life.

28.　　Defendant Paull did not listen to Dekany and he began to frequently stop by her home unannounced and in uniform with his service weapon.

29.　　 Again, Plaintiff Dekany begged Defendant Paull to leave her alone and cease showing up at her residence unannounced.

30.　　In late August or September of 2014, Defendant Paull stopped by her home unannounced, in a severely drunken state at or around 2:00 am.

31.　　Plaintiff Dekany awoke to sounds of a break-in, which sounded as if someone was smashing in her bedroom window.

32.　　Defendant Paull texted Plaintiff Dekany that he was outside her home and claiming that he would wait all night and wouldn't leave without her coming outside.

33.　　Defendant Paull ripped and ultimately destroyed the screen of the window in an attempt to break in Plaintiff Dekany's residence.

34.　　Defendant Paull laid on her porch with his service weapon across his chest, then pointed the service weapon at Plaintiff Dekany's head and threatened to kill her if she ever left him.

35.　　Defendant Paull eventually turned the service weapon on himself, and claimed he "can't live without her."

36.     In a complete state of terror, Plaintiff Dekany agreed to work things out, and ultimately Defendant Paull left her residence.

37.     The next day, Defendant Paull called and said that he ran a background check on a male friend of hers and threatened to have him arrested if she did not end all communications with him immediately.

38.      Plaintiff Dekany did what Defendant Paull asked and ceased all communications with her male friend because she feared for her life and his life as well.

39.     Defendant Paull admitted to Dekany that he had acted out of control.

40.     Defendant Paull decided he needed to put together a plan together with his fellow officers so he wouldn't kill Plaintiff Dekany with his service weapon.

41.     Defendant Paull with other officers within APD, Officer Brian Harding and Crime Analyst Mary Infantino, conspired and created a plan that Plaintiff Dekany should contact the other officers if Defendant Paull should ever again threaten her life with his service gun.

42.     This absurd safety plan was also communicated with Defendant Paull's therapist, Ellen Harrington, PHD, at Saint Thomas Hospital as Detective Paul admitted to homicidal thoughts and prior abuse of Plaintiff Dekany.

43.     The other officers agreed to protect Defendant Paull and did not advise proper authorities of Defendant Paull's homicidal thoughts.

44.     During this time, Defendant Paull was also abusing prescription drugs and alcohol but none of the officers intervened or reported his illegal activities while on duty, while driving and further, while carrying his service weapon.

45.     The APD officers agreed to intervene quietly if need be, and this was the plan that was reported to Plaintiff Dekany to provide a false sense of safety.

6

46.  This plan to involve a fellow officer with the APD, Officer Brian Harding, and Crime Analyst Mary Infantino, served only to protect Defendant Paull and not to protect Plaintiff Dekany.

47.  On Thursday, November 27, 2014, Thanksgiving day, Defendant Paull stopped by Plaintiff Dekany's house wearing his service weapon, was extremely intoxicated, went into a violent tirade, attacked Plaintiff Dekany, threw her to the ground, dragged her around the house by her hair and choked her, leaving considerable bruising to her face and neck.

48.  Plaintiff Dekany's vision started to blur as Defendant Paull flipped her onto her stomach, pulled down her pants, and began to rape her until she passed out and was unconscious for an unknown amount of time.

49.  When Plaintiff Dekany woke up, she heard her young son crying at the bottom of the staircase. Defendant Paull said to Plaintiff Dekany, "go get your son, bitch!"

50.  Plaintiff Dekany did not call the police, as she was told by Defendant Paull that he was untouchable, and that other officers were aware of his threats to her and would not turn him in for any disciplinary action or protect her.

51.  Defendant Paull also told Plaintiff Dekany that he could easily kill her and get away with it.

52.  Plaintiff Dekany went to her doctor soon after the rape due to physical complications and excessive trauma of the rape.

53.  Following the rape, Defendant Paull acted remorseful and showered additional financial support of Plaintiff Dekany.

54.  On November 28, 2014, Defendant Paull sent a text to Plaintiff Dekany, saying "I've never hurt someone before. I'm actually getting worse"; "I'm not a good man; I am a Monster."

55.     At the time, Defendant Paull was receiving treatment from Ellen Harrington, Ph.D., and Defendant Paull told Plaintiff Dekany that he had admitted the rape to his therapist and had strong intentions to kill Plaintiff Dekany.

56.     On December 27, 2014, Plaintiff Dekany was at her home with Brandon Dowler ("Brandon"), and his two children. Defendant Paull was in uniform and on duty, drove by the Dekany household, saw Brandon's vehicle and began to call and text Plaintiff Dekany obsessively.

57.     Plaintiff Dekany ignored Defendant Paull's texts, so he began banging on the windows and door with his Asp, leaving marks and dents to her residence.

58.     Defendant Paull demanded to know how often Brandon's truck was in the driveway and he went to the neighbors asking about Brandon's truck stating that he needed the information for an investigation.

59.     Plaintiff Dekany was frightened for her safety, and that of the others in her home.

60.     Brandon called 911.  Defendant Paull heard the call go out over the police radio and left the premises.

61.     A group of officers, including Defendant Kelly, the former partner of Defendant Paull for a decade, arrived and entered Plaintiff Dekany's house. Upon learning that the incident involved Defendant Paull, Defendant Kelly yelled, "oh f***."

62.     Plaintiff Dekany told Defendant Kelly that she feared for her life and begged him for help; however, Defendant Kelly called Defendant Paull alerting him to the situation.

63.     Defendant Kelly told Plaintiff Dekany that he would not be doing anything or taking any report.

64.     Defendant Paull called and texted Plaintiff Dekany, taunting her and bragging that he is "untouchable" and "above the law" because Defendant Kelly refused to even file a report.

65.     On this same day, Defendant Paull called Plaintiff Dekany, saying things like "I will kill you," "I know what you've f***ing done," etc.

66.     Eventually, Brandon left, after which time Defendant Paull called Plaintiff Dekany demanding that she come to his house immediately.

67.     Defendant Paull threatened to put a bullet in Plaintiff Dekany's son's head and to kill her if she did not come to his house right then and at that time.

68.     Upon arriving at his house with her son, Defendant Paull told Plaintiff Dekany that he took a bunch of Ativan, a sedative, which he commonly referred to as candy. Defendant Paull had his gun while proceeding to say, "you know how much I love you."

69.     In survival mode, Plaintiff Dekany attempted to appease Defendant Paull that evening to protect her son and herself.

70.     Defendant Paull continued to stalk Plaintiff Dekany and harass her by sending menacing text messages that show he was clearly obsessed with her every move.

71.     Plaintiff Dekany believed that Defendant Paull was using police surveillance programs and/or equipment to search her phone, track her whereabouts, research her friends and further to text her when she had him blocked.

72.     Plaintiff Dekany also believed that Defendant Paul had accessed her home when she was not there and entered without her permission.

73.     Defendant Paull would run OLEG reports, and other programs, on any vehicles that were parked at Plaintiff Dekany's house.

74.  On or about April 4, 2015, Defendant Paull placed a bullet taken from his service weapon on the hood of Brandon's truck.

75.  On April 5, 2015, Defendant Paull told Plaintiff Dekany that he would have killed Brandon if the kids had not been home.

76.  On April 7, 2015, Defendant Paull sent Facebook messages to Plaintiff Dekany telling her that he was going to go to the homes of every man she had ever dated and would not stop until Defendant Dekany came to him. He sent photos of himself sitting outside of some of the known male houses with a gun.

77.  On Monday, April 7, 2015, while Plaintiff Dekany was in North Canton, Ohio at Brandon's hockey game, she received threatening Facebook messages from Defendant Paull.

78.   Defendant Paull threatened that unless Plaintiff Dekany met with him, he was going to kill Brandon and Plaintiff Dekany, by putting a bullet in their heads.

79.  Plaintiff Dekany and Brandon left the hockey game immediately, and drove to the Stow Police Department.

80.  During this drive, Defendant Paull sent her photos of himself standing in front of Brandon's residence, located in Stow, and photos of his gun.

81.  Defendant Paull also stated that he could see a man lying on the couch inside of Brandon's home, which, unbeknown to Defendant Paull, was Brandon's ill father.

82.  Defendant Paull also indicated that he was sitting in his vehicle drinking beer, that he was highly intoxicated with his service weapon.

83.  At the Stow Police Department, Plaintiff Dekany used the after hours phone to describe what was happening, then waited for 10 minutes before an officer came out to speak with her.

84. Plaintiff Dekany then repeated the situation to Officer Corfman, and offered to show him Defendant Paull's threatening communications. Officer Corfman responded that he did not need to see them, so Plaintiff Dekany asked to see a supervisor.

85. Officer Corfman stated that the supervisor was busy, then left Plaintiff Dekany for 10-15 minutes. Brandon stayed inside the vehicle with all of the children so as to not expose them to the incident. Defendant Paull continued to text Plaintiff Dekany during this time, telling her that he was still at Brandon's house.

86. Plaintiff Dekany then called Brandon, told him that Officer Corfman was not taking her seriously, and Brandon said he was going to call 911.

87. Officer Corfman came out and asked Plaintiff Dekany about the 911 call, and asked if she was making it up. At this point, Plaintiff Dekany was in tears, and feared for her own and Brandon's safety, along with that of Brandon's father, Jack, still inside Brandon's home.

88. At that point, Sergeant Prusha came to speak with her, and Plaintiff Dekany offered to show her all the communications and threats she had received, including one that indicated that when Brandon calls the cops "they will shoot me, I won't even need to do it myself."

89. After that, Sergeant Prusha informed Plaintiff Dekany that Defendant Paull had been stopped by officers near Brandon's house. Sergeant Prusha said that the officers did not feel the need to check Defendant Paull for sobriety and that she was going to have Defendant Paull "pink slipped."

90. The Stow Police Department allowed the Akron Police Department to take charge and they took Defendant Paull for psychiatric observations.

11

91.  Even while Plaintiff Dekany was speaking with Sergeant Prusha, Defendant Paull continued to send Plaintiff Dekany threatening messages, which continued for hours while Defendant Paull was at the hospital after being escorted there by APD.

92.  Stow Police did not take action, did not give a field sobriety test to Defendant Paull, did not take his service weapon from him and permitted the harassing behavior to continue until they washed their hands of him by calling Defendant Paull's fellow officers at APD.

93.  Sergeant Prusha told Plaintiff Dekany that there was nothing else they could do for her.

94.  Plaintiff Dekany went to Brandon's home, at which time she discovered that Defendant Paull had written a message on the porch with chalk that he had taken from her house that said "I love you Alexis…mine." He had also left a Summer Shandy beer bottle, Defendant Paull's favorite beer, in the driveway.

95.  It is not clear whether SPD ever even went to Brandon's house after receiving Brandon's 911 call, but his father reported that no one had spoken to him.

96.  Plaintiff Dekany went to the APD that evening and they requested her phone and took the phone to allegedly download Defendant Paull's text messages and Facebook messages.

97.  After Plaintiff Dekany received her phone back from the police officers, the video that Defendant Paull sent her via Facebook in which he is threatening to kill her was no longer on her phone and Plaintiff Dekany believes it was purposely deleted by APD.

98.   Ultimately, Judge Amy Corrigall Jones issued a temporary protection order against Defendant Paull.

99.  Defendant Paull violated the TPO numerous times by contacting Plaintiff Dekany.

100.  Plaintiff Dekany contacted the Akron Police Department after the violated TPO, but they refused to take any action to protect Plaintiff Dekany.

101.    After the fourth time that Defendant Paull violated the protective order, Plaintiff Dekany contacted the APD Detective on the case, Bertina King, and Defendant Paull was <u>finally</u> arrested.

102.    In April 2015, Defendant Paull was arrested for crimes of violence against Plaintiff Dekany in Stow and Akron.

103.    Defendant Paull was indicted for felonious assault for a November 27, 2014 incident, attempted aggravated burglary on December 28, 2014, intimidation of a crime victim or witness on November 27, 2014 through April 10, 2015, menacing by stalking on November 27, 2014 through April 10, 2015, unauthorized use of the Ohio Law Enforcement Gateway (5 counts) on April 14, 2014, October 4, 2014, October 15, 2014, December 26, 2014, December 28, 2014, and violating a protection order on April 15, 2015.

104.    Defendant Paull's ongoing violence, stalking and menacing caused Plaintiff Dekany to be so fearful for the safety of herself, her son, and others, that in May, 2015, she requested and was granted an emergency Concealed Carry gun permit.

105.    Defendant Paull sent Plaintiff Dekany text messages admitting to the action as alleged on November 27, 2014 that said, "Yeah enough to know I just hurt you and need to leave you alone," "I'm embarrassed and ashamed to even look at you," and "You have no idea how little I think of myself now."

106.    As of the time of the filing of this Complaint, Plaintiff Dekany is receiving daily therapy and counseling due to the severe psychological, physical, and emotional harm caused by the Defendants and their actions described herein.

107.    Defendants' failures to investigate and/or prosecute Defendant Paull for the conduct described herein against Plaintiff Dekany, and their failures to protect Plaintiff Dekany

13

from Defendant Paull's unlawful conduct, constitute a conspiracy to immunize Defendant Paull for his unlawful conduct.

108.   Officials did not bring charges against Defendant Paull even though Plaintiff Dekany reported it to the Akron Police Department and Stow Police Department.

109.   Plaintiff Dekany passed a private polygraph examination with an indication of truthfulness greater than 97%.

**COUNT 1: Negligent hiring, training and retention**
**Against the City of Akron, Akron Police Department, and Does 1-5**

110.   Plaintiff incorporates each and every allegation previously set forth as if specifically rewritten herein.

111.   An employment relationship existed between the City of Akron, the APD and Does 1-5 on one hand, and Defendants Paull and Kelly on the other.

112.   Defendants Paull and Kelly were incompetent, as manifested by Defendant Paull's menacing, threatening, violent and otherwise dangerous and unlawful behavior, and Defendant Sergeant Kelly's propensity to cover up and hide a fellow police officer's unlawful conduct, and his refusal to protect citizens from a fellow police officer's menacing, threatening, violent and otherwise dangerous and unlawful behavior.

113.   The City of Akron, the APD and Does 1-5 had actual and/or constructive knowledge of such incompetence.

114.   The actions and/or omissions of the City of Akron, the APD and Does 1-5 caused Plaintiffs' injuries.

115.   The negligent hiring, training, and/or retention of Defendants Paull and Kelly by the City of Akron, the APD and Does 1-5 was the proximate cause of Plaintiff's injuries.

116.    As a result of the negligent hiring, training, and/or retention of Defendants Paull and Kelly by the City of Akron, the APD and Does 1-5, Plaintiff has suffered, and continue to suffer, damages, including, but not limited to, pain and suffering, severe emotional distress, loss of companionship, loss of past and future earnings, and other damages to be proven at trial.

### COUNT 2: Negligent hiring, training and retention
### Against the City of Stow, Stow Police Department, Officers Corfman and Prusha and Does 6-10

117.    Plaintiff incorporates each and every allegation previously set forth as if specifically rewritten herein.

118.    An employment relationship existed between the City of Stow, the SPD office and Does 6-10 on one hand, and SPD employees Officer Corfman and Sergeant Prusha on the other.

119.    SPD employees Officer Corfman and Sergeant Prusha were incompetent, as manifested by their refusals and/or failures to assist and protect a citizen from another police officer's menacing, threatening, violent and otherwise dangerous and unlawful behavior.

120.    The City of Stow, the SPD and Does 6-10 had actual and/or constructive knowledge of such incompetence.

121.    The actions and/or omissions of the City of Stow, the SPD and Does 6-10 caused Plaintiff's injuries.

122.    The negligent hiring, training, and/or retention of SPD employees, Officer Corfman and Sergeant Prusha, by the City of Stow, the SPD and Does 6-10 was the proximate cause of Plaintiffs' injuries

123.    As a result of the negligent hiring, training, and/or retention of SPD employees, Officer Corfman and Sergeant Prusha by the City of Stow, the SPD and Does 6-10, Plaintiff has suffered, and continue to suffer, damages, including, but not limited to, pain and suffering,

severe emotional distress, loss of companionship, loss of past and future earnings, and other damages to be proven at trial.

### COUNT 3: Violation of First Amendment Civil Rights Under 42 U.S.C §§ 1983 Against Defendants Paull and Kelly

124. Plaintiff incorporates each and every allegation previously set forth as if specifically rewritten herein.

125. Calling 911 is a constitutionally protected activity under the First Amendment's right to petition the government for redress of grievances.

126. In violation of the First Amendment's protections, Defendants Paull and Kelly responded with retaliation after Plaintiff Dekany dialed 911 by, among other things, refusing to make a report or assist Plaintiff Dekany upon their arrival at her home, and giving assistance to Defendant Paull by alerting him of Plaintiff Dekany's call so he could leave the scene without any consequences.

127. Plaintiff Dekany's constitutionally protected conduct, calling 911, caused the retaliation of Defendants.

128. Defendant's failure to assist Plaintiff Kelly, along with their provision of assistance to her assailant, Defendant Paull, are likely to deter her from exercising her First Amendment rights in the future.

129. Defendant's retaliation entitles Plaintiff Dekany to recover damages pursuant to 42 U.S.C. § 1983.

### COUNT 4: Violation of Fourth Amendment Civil Rights Under 42 U.S.C. §§ 1983 Against Defendant Paull

130. Plaintiff incorporates each and every allegation previously set forth as if specifically rewritten herein.

131.  The actions of Defendant Paull contained herein, including but not limited to his repeated threats to kill Plaintiff Dekany, brandishing his weapon toward Plaintiff Dekany, actually and constructively restraining and physically violating her, constitute violations of Plaintiff Dekany's rights under the Fourth Amendment of the United States Constitution, which protect against excessive force, and unreasonable and unlawful searches and seizures.

132.  Defendant Paull's actions against Plaintiff Dekany entitle her to recover damages pursuant to 42 U.S.C. § 1983.

**COUNT 5: Violation of Fourteenth Amendment Civil Rights Under 42 U.S.C. §§ 1983 Against Defendant Paull**

133.  Plaintiff incorporates each and every allegation previously set forth as if specifically rewritten herein.

134.  The actions of Defendant Paull contained herein, including but not limited to his actual and constructive restraint of Plaintiff Dekany, and his bodily violations of her, constitute violations of Plaintiff Dekany's due process rights under the Fourteenth Amendment of the United States Constitution.

135.  Defendant Paull's actions against Plaintiff Dekany entitle her to recover damages pursuant to 42 U.S.C. § 1983.

**COUNT 6: Supervisory liability for § 1983 violations Against the City of Akron, Akron Police Department, and Does 1-5**

136.  Plaintiff incorporates each and every allegation previously set forth as if specifically rewritten herein.

137.  Defendants City of Akron, Akron Police Department and Does 1-5 played more than a passive role in, implicitly authorized, approved, knowingly acquiesced and/or in some

other way directly participated in Defendant Paull's unlawful, unconstitutional conduct described herein.

138. Defendants City of Akron, Akron Police Department and Does 1-5 are subject to supervisory liability for the actions of Defendant Paull as described herein, entitling Plaintiff Dekany to recover damages pursuant to 42 U.S.C. § 1983.

## COUNT 7: Supervisory liability for § 1983 violations
## Against the City of Stow, Stow Police Department, and Does 6-10

139. Plaintiff incorporates each and every allegation previously set forth as if specifically rewritten herein.

140. Defendants City of Stow, Stow Police Department and Does 6-10 played more than a passive role in, implicitly authorized, approved, knowingly acquiesced and/or in some other way directly participated in Defendant Paull's unlawful, unconstitutional conduct described herein.

141. Defendants City of Stow, Stow Police Department and Does 6-10 are subject to supervisory liability for the actions of Defendant Paull as described herein, entitling Plaintiff Dekany to recover damages pursuant to 42 U.S.C. § 1983.

## COUNT 8: Monell related claims
## Against the City of Akron, APD, Does 1-5 and Defendants Paull and Kelly

142. Plaintiff incorporates each and every allegation previously set forth as if specifically rewritten herein.

143. Defendants permitted its employees to engage in a clear and persistent pattern of illegal, unconstitutional activity including, but not limited to knowingly permitting its employees to ignore and cover up the dangerous, life threatening, illegal conduct of a fellow officer, to the harm of innocent civilians.

144.   Defendants were on actual or constructive notice of their employees' clear and persistent illegal conduct as evidenced, in part, by the fact that it was wide-spread throughout the two precincts, including supervising officers.

145.   Defendants approved of their officers' clear and persistent illegal conduct given the fact that supervising officers participated in the conduct and Defendants himself bragged about the fact that he was "untouchable" and "above the law."   At the very least, Defendants tacitly approved of the conduct by virtue of their deliberate indifference in failing to act against the officers' pervasive illegal conduct such that it was an official policy of inaction regarding Plaintiff's complaints against a fellow officer.

146.   As a direct and proximate cause of the Defendants' knowledge and inaction, Plaintiffs suffered continued and repeated constitutional violations by Defendants Paull, Kelly, and Does 1-10, all of which could have been prevented and Plaintiff's injuries lessened, if Defendants had enforced policies to protect the citizens they were obligated to protect as opposed to the policies they uphold to protect their fellow officers.

### COUNT 9: Violation of 42 U.S. Code § 1983 - Civil Conspiracy
### Against all Defendants, including Does 1-10

147.   Plaintiff incorporates each and every allegation previously set forth as if specifically rewritten herein.

148.   The Defendants, including Defendants John Does 1-10, conspired to protect a fellow officer, Defendant Paull, from criminal charges and adverse employment actions by blatantly ignoring Plaintiff's cries for legal protection to which she was entitled, failing to investigate Plaintiffs' allegations of Defendant Paull's abuse (verbal and psychological), stalking, menacing, and attempted breaking and entering, and failing to protect Plaintiff from Defendant Paull's criminal conduct.

19

149.   Each Defendant participated in the conspiracy when they each were called to action by Plaintiff's formal reports to their respective police departments but then blatantly declining to perform any investigation into the circumstances, failing to enforce protection orders against Defendant Paull, and leaving Plaintiff vulnerable to Defendant Paull's threatening actions and conduct.

150.   As a direct and proximate result of Defendants' conspiracy, Plaintiff's constitutional rights were violated and she suffered severe emotional and physical injuries requiring continuous and ongoing therapy to this day.

**WHEREFORE**, Plaintiff request all remedies and relief available under the law, including, but not limited to, compensatory damages in an amount over seventy-five thousand dollars ($75,000.00), punitive damages in an amount to be determined at trial, pre and post judgment interest, all attorneys' fees, expert fees, costs and any other relief this Court deems appropriate.

Respectfully Submitted,

/s/Laura L. Mills
Laura L. Mills, Esq. (0063011)
Natasha Wells Niklas, Esq. (0067216)
*Counsel for Plaintiffs*
**Mills, Mills, Fiely & Lucas**
101 Central Plaza South
200 Chase Tower
Canton, OH  44702
Phone: 330.456.0506
Fax: 855.764.3543
LMills@MMFLlaw.com
NNiklas@MMFLlaw.com

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

/s/Laura L. Mills
Laura L. Mills, Esq. (0063011)

## INSTRUCTIONS TO CLERK

Please serve the above named Defendants by certified mail, return receipt requested.

/s/Laura L. Mills
Laura L. Mills (0063011)